Bouldin, J.
My opinion is, that the Circuit court erred in giving to the jury the instruction moved by the plaintiff in the court below, even as modified by the court. The foundation of the suit was a promissory note, executed the 18th of September 1861 for the sum of |2,200, negotiable and payable at the office of discount and deposit of the Bank of Virginia at Lynchburg, which was endorsed for the accommodation of the maker by D. Bodes and S. Garland; was discounted for the benefit of the maker by the bank aforesaid; and on the 15th day of November 1861 was duly pi’otested for non-payment. The note thus protested was executed in renewal of an accommodation note made as far back as 1858 by same drawer, endorsed for his accommodation by same endorsers, and discounted by same bank for the . benefit of the drawers. It was renewed at bank from time to time with same endorsers, until protested as aforesaid. Shortly before said protest Samuel Garland died, and ■some time thereafter D. Bodes, the other endorser, also *916 died. Both endorsers were possessed, at the time of their respective deaths, of ample means to meet all their liabilities. Garland was, in fact, a man of great wealth.
The note remained unpaid at bank, and no effort seems to have been made to collect it, nor any notice, apparently, taken of it, until about the time of the passage of the law of the Confederate Congress curtailing the currency of the Confederate States one-third. Just before that law took effect, there was. some effort made by Burton, the maker of the note, to-pay it in Confederate States treasury notes, which failed for reasons set forth in the record, but not ^necessary to be further noticed. In the meantime theappellee Slaughter, had qualified as the adm’r debonis non with the will annexed of Samuel Garland dec’d, and had received and distributed a large estate of his testator.
It being known to the bank aforesaid and its cashier,, that Slaughter was the administrator &e. of Garland, and that said note was still wholly unpaid, the cashier, some short time before March 1866, approached said Slaughter on the subject, informing him that the bank was receiving its own notes worth only about 88 cents, to the dollar, in payment of debts due the bank, and suggesting to him to pay the note in that currency. Slaughter did not then pay it, but soon afterwards, about the 1st March 1866, informed the cashier that he had no assets of his testator Garland, and could not, and would not pay the note as administrator, but would take it up on his own individual account; and he wished such endorsement or transfer made thereon as would show the fact that it had been taken up by him individually, and was his own property; and thereupon a statement of the debt was made on the *917 back of the note by the cashier, amounting on the 1st ... . -ii of March 1866, principal, interest and. notarial charges, to the sum of $2770; which was received of Slaughter in the issues of the bank; and the following additional endorsement was made by the cashier :
“By cash of Jno. F. Slaughter $2770.”
“ March 2d, 1866.”
Signed “W. Q. Spence, Cashier.”
Spence further proved, that he had no authority, according to the custom of the bank, to sell the solvent notes due thereto; and that he did not sell the note in controversy. That as to the bank, the transaction with Slaughter ivas a payment, and the bank had no further interest in the note; but the same was left in bank as Slaughter’s property, to give the parties bound thereby an opportunity to pay it. There was other testimony in the record not necessary to be repeated, in the view which I have taken of the case.
After the evidence had been all concluded, the plaintiff by counsel moved the court to instruct the jury as follows:
“ If the jury believe from the evidence, that John F. Slaughter, the plaintiff in the action, acquired the note sued upon with his own means, and for his own individual benefit; then the said plaintiff is entitled to recover against the dtefendant E. J. Burton, the full amount of said note, with interest thereon from the day it fell due, till paid with costs of protest; notwithstanding the said Slaughter may, at the time of obtaining the same, have been administrator with the will annexed of Samuel Garland dec’d, who was one of the endorsers of said note, and notwithstanding he may haye paid for it in a depreciated currency.”
*918 The defendant objected to the giving of this instruction to the jury; and the same was modified by thacourt as follows: “Unless the jury shall believe that be acquired it by means of or under color of his office as administrator; then, in that event, he is not entitled to recover more than he paid for it, although it may have been paid for, with his own money and not out of the estate of his testator.” As thus modified, the-instruction was given; and thereupon the defendant excepted.
There were other instructions asked by defendant, and refused by the court; and the case was then sub-' mitted to the jury, who rendered a verdict for the-full amount of the note and notarial charges, with-interest from the 15th November 1861 (the day of protest). The defendant then moved to set aside the-verdict, and grant him a new trial; which motion was overruled by the court, and judgment entered for plaintiff according to the verdict. The defendant again excepted.
My opinion is, that the court erred in instructing the jury that a personal representative can under any circumstances, or in any event, either by purchase or payment, so acquire a credit or debt of the estate represented by him, as to secure to himself an individual benefit thereby. He is obliged to take notice, when he accepts the office of administrator, that he is-entrusted by the terms of his office and the law of the land, with the exclusive charge of the rights and interest of his testator or intestate, in the subject matter-before him; and these rights and interests cannot,, under any circumstances, be ignored by him. He is bound, both in law and morals, to protect them. It is therefore the well settled law of this State, based on a wise public policy, and sustained by the soundest prin *919 ciples of equity law, of morality, and of iustice, that , , ’ such fiduciary can m no event so deal with his trust as to secure to himself an individual benefit thereby, at the expense or hazard of the trust estate.
The effect of the instruction under consideration, (however intended,) would be to enable the administrator to ignore this salutary rule, and to buy up a liability of his intestate at about one third of its real value; and then to enforce it for its full amount— even against his testator, if necessary; for such must be the result of the instruction; the fiduciary being regarded thereby, in certain events, as a bona fide holder for value, in his own right, of the note endorsed by his testator: and thus by treating the transaction as a purchase by Slaughter individually, instead of a payment as administrator, as it should have been, Slaughter would be allowed to realize individually, about three times as much as he paid for a debt of his testator, with the right, should circumstances require it, to charge the entire amount to his testator’s estate. Such dealing by a fiduciary with his trust, cannot, I think, be tolerated for a single moment, by this court.
My opinion therefore is, that we are bound both in law and morals, to treat the acquisition by Slaughter of the note in controversy as an acquisition by him in his fiduciary character, and not as a payment or purchase by him individually. I would here remark, that the proofs, in my opinion, shew a payment and not a purchase. Unless made then by Slaughter in his fiduciary character, it was officiously made by him as a mere stranger, without privity of contract or request of parties. For such voluntary payment made by a stranger to the contract, no action could be maintained. But as I *920 have already stated, I am of opinion, that the payment must be regarded as made by Slaughter as fiduciary. This is required, as well by the law of the land ag py the interest of Slaughter himself; for we have seen, that he could acquire the note in question in no other way, under the facts of the case. Thus paying, however, he would acquire precisely the rights of Garland himself, had he paid the note in his lifetime and after protest: and the next question is, what are these rights ?
Clearly, I think, as a general rule, the rights of a holder of the note who has acquired it by composition or payment as surety of the parties bound to him as principals: viz., the right of a full indemnity for the money paid for the principals; in other words, the right to recover of the principals the value paid by the surety for them—nothing more and nothing less. That this is so, especially in cases of accommodation paper, is abundantly shewn by the elementary writers and decided cases on the subject; but I will content myself with referring to only two recent cases in this court.
In Barnett v. Cecil, 21 Gratt. 95, Judge Moncure, delivering the opinion of the whole court, uses the following language: “It is certainly true, as a general rule, that the contract which the law implies between a principal and his surety, is merely a contract of indemnity; and that the measure of the liability of the principal to the surety is the amount which the latter has to pay for the former on account of his suretyship ; so that if the discount at bank had been the origin of the transaction in this case, and the note had been made, endorsed and discounted for the accommodation of the maker and first endorser, the last *921 endorser, Cecil, would have been a mere surety of the -other parties, and could have recovered of them only the value of what he had to pay for them.”
The principles thus announced are consonant with justice and equity, and I think correctly propound the law of the case stated by the judge.
The case before us is substantially, indeed almost identically, the case stated by the learned judge. It is the case of a note endorsed by Rodes and Garland in succession for the accommodation of the maker, and discounted at bank for his benefit. It was discharged, or taken in by Garland, the last endorser, or, what is the same thing, by his administrator, by paying therefor bank notes of the value of about one-third the value of the note in controversy. According to the opinion of Judge Moncure, in Barnett v. Cecil, Slaughter should have recovered of the other parties to the note “only the value of what he had to pay for them.”
Very similar in principle and effect, although not exactly a case of indorser or surety, is the recent case of Ashby’s adm’r &c. v. Porter &c., decided at Staunton, and to be reported in 26 Gratt., supra, 455.
It was briefly as follows: Ashby & Sons were citizens of Clarke county, Virginia, and had become indebted to the Farmers’ Bank at Winchester before the war between the United and the Confederate States of America, in sundry amounts due by note. These notes were renewed from time to time as ante-war debts until •January 1862. On the 80th day of that month the entire indebtedness of Ashby & Sons to the bank was consolidated, amounting to $7,700, and one note given therefor at 60 days after date, which was intended to be payable in a sound currency equivalent to specie. *922 This note was protested for non-payment on the 3d of April 1862. Shortly before that time, viz: on the 7th of March 1862 the Winchester bank removed with its books and effects to the town of Farmville, Va., to 7 avoid the hazards of war, and continued to do business at that place to the close of the war.
The note of Ashby & Sons having been protested as aforesaid, and it not being convenient for them to raise the money and send it to Farmville, they requested Colin C. Porter, then a resident of Jefferson county, Va., a man of large means and extensive business, which very frequently took him to Kichmond,. to pay off the note for them, and they would execute their note to him for the amount, payable at 12 months with interest from date. Porter did so, making the payment in Confederate States treasury notes; and on the 19th day of April 1862 Ashby & Sons executed their note to Porter for $7,723.24, payable 12 months, after date. Nothing was said by either party about the currency in which the note to Porter was to be paid. Suit was brought on this note after the war,, and the question was what should be recovered by Porter on the note.
Held by the court that Porter was entitled to recover only the value of the Confederate money paid by him for the note to the bank on the 19th day of April 1862, when the payment was made, and not the amount of' the note to the bank.
For the reasons above stated, I am of opinion that the Circuit court erred in the instruction given to the jury, and for the same reasons that there was error in overruling the motion for a new trial.
The objection that the suit cannot be maintained in the name of John F. Slaughter, individually, does not *923 seem to be seriously pressed. Whatever the ruling on that subject may have been formerly, it is now settled, that wherever the transaction immediately under con sideration, like the payment in this case, occurred after the death of the testator, and with the administrator himself, suit may be brought with, or without the descriptive words “administrator,” &c., or the plaintiff may count both ways in the same action, the words referred to being treated merely as “ diseriptio personae.”
I have felt more difficulty as to the form of action : whether in this case it should have been indebitatus assumpsit, instead of debt. Edwards in his work on Bills and Notes, p. 293-4, says: “Where the surety has paid the money on his principal’s debt, or satisfied the debt, the law implies an undertaking on the part of the latter to refund the amount paid; and it was formerly held that the proper form of action was indebitatus assumpsit for money paid.”
This would imply that the rule was changed, and it is now well settled that the holder, when the note has been paid or taken up by an indorser, is not compelled to sue in assumpsit, but may sue directly on the note as holder, taking care to confine his recovery to the actual value paid by him for the note.
Eor these reasons I am of opinion to reverse the judgment with costs to appellant, and award a new trial, and remand the case to the Circuit court, to be further proceeded in according to the principles above declared.
Christian, J. concurred in the judgment.
Anderson and Staples, J’s, concurred in the result..
*924 Moncure, P. concurred in the opinion of JBouldin, J.
The judgment was as follows:
This day came again the parties by counsel, and the court having maturely considered the transcript of the record and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the Circuit court erred in instructing the jury, that the appellee Slaughter, whilst he was the administrator de bonis non of Samuel Garland deceased, one of the endorsers of the note in controversy, could so acquire it as to secure to himself an individual benefit thereby, the court being of opinion, that the relation of Slaughter to his testator’s estate was such as to forbid the acquisition by him, whether by purchase or payment, except in his fiduciary character.
The court is further of opinion, that the Circuit court erred in instructing the jury that the appellee Slaughter being administrator as aforesaid, could in any event, either by purchase or payment, acquire larger rights than his testator Garland would have had, had he himself paid the note in his lifetime, and after protest. Those rights in this ease would have been only the rights of a surety, to be fully indemnified for his payment on account of the principal: and such indemnity is fully secured to the principal by the payment of the value paid by the surety. That was the extent of Slaughter’s right of recovery in this •case.
For the same reasons the court is of opinion that the Circuit court erred in overruling the motion for a -new trial.
It is therefore considered by the court that the judg *925 ment aforesaid be reversed and annulled, with costs to the appellant, and a new trial be awarded him; and the cause is remanded to the said Circuit court to be further proceeded in, in accordance with the principles of this order.
Judgment reversed.